# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

TREVOR R. ROBINSON,      )
                                     )

    Plaintiff,           )
                                     )

    vs.                 )     Case number 4:13cv1513 TCM
                                     )

CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
                                   )

    Defendant.        )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying Trevor R. Robinson's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## Procedural History

Trevor R. Robinson (Plaintiff) applied for DIB and SSI in August 2010, alleging that he became disabled on January 1, 2007, because of bipolar disorder and schizophrenia. (R.[1] at 128-34, 135-38, 189.) His applications were denied initially and after a hearing held in

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

January 2012[2] administrative law judge ("ALJ") Jhane Pappenfus. (Id. at 14-53, 57,58, 76-81.) The Appeals Council then denied Plaintiff's request for review of the ALJ's decision, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and John F. McGowan, Ed.D., testified at the administrative hearing.[3]

Plaintiff testified that he currently lives in a home with a friend. Plaintiff completed the eleventh grade in high school, but did not graduate. He has no other education or training. (Id. at 17-18, 50-51.)

Plaintiff hears voices telling him negative things, such as that people are trying to kill him and will get him if he leaves the house. He does not go outside that much and does not like to be around people. (Id. at 23-24.) He quit his last job, as a fast food cook at Wendy's, because he thought the people there were trying to kill him. (Id. at 25-26.) He sees a psychiatrist and has been taking medication for approximately two years; he had not taken medication before then because he could not afford it. (Id. at 28.) Also, when he cannot

---

[2]A previously-scheduled hearing was continued to allow Plaintiff an opportunity to secure legal representation. (Id. at 8-13.)

[3]The Court has reviewed the entire administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. The recitation of specific evidence in this Memorandum and Order, however, is limited to that relating to the issues Plaintiff raises on appeal.

afford the medication he does not take it every day; his psychiatrist recently gave him a thirty-day supply of medication at no cost.  (<u>Id.</u> at 29, 32-33.)  When on medication, he continues to hear voices, but they are softer and not as loud.  (<u>Id.</u> at 26-27.)  He is unable to tune out the voices, even when they are soft.  (<u>Id.</u> at 34.)  He is unable to see a counselor because of his inability to pay for such services.  (<u>Id.</u> at 29-30.)  Plaintiff testified that he was last hospitalized for his condition in 2008.  (<u>Id.</u> at 27-28.)

Plaintiff testified that he was tired of constantly hearing the voices and has told his doctors that he wanted to die.  He does not know who he can trust.  (<u>Id.</u> at 30-31.)  The voices interfere with his concentration, causing him to be confused about what to do because he does not know who is talking.  The voices also interfere with his ability to work at a quick pace.  He experienced these problems while working at Wendy's.  (<u>Id.</u> at 31-32, 34-35.)

Describing his daily activities, Plaintiff testified that he wakes up around 9:00 a.m. and watches television during the day.  He naps throughout the day because of sleeping difficulties at night.  He sleeps at night from half an hour to an hour and then is awake for three or four hours because of the voices.  He repeats this cycle throughout the night.  (<u>Id.</u> at 23-24.)

Dr. McGowan, testifying as a vocational expert ("VE") without objection, classified Plaintiff's past work as a fast food worker as light and having a specific vocational preparation ("SVP") level of 2 and as a marble machine tender as light and having an SVP level of 3.  (<u>Id.</u> at 37-38.)

The ALJ then asked Dr. McGowan to consider a hypothetical claimant who is limited to medium and unskilled work; who person should not work in a setting that includes constant, regular contact with the general public; and who should not perform work that includes more than infrequent handling of customer complaints. Asked if this claimant can perform Plaintiff's past relevant work, Dr. McGowan testified that such a person can perform the jobs of a marble machine tender and a fast food worker as Plaintiff actually performed them. (Id. at 39, 44.) Such a person can perform Plaintiff's past work even if he was limited to light exertional work. This person can also perform other light work, such as bench assembler, hospital product assembler, and plastic products inspector and hand packager. These jobs exist in significant numbers in the state and national economies. (Id. at 40-41.)

In response to questions from counsel, Dr. McGowan testified that a person will not be able to maintain employment if he cannot follow instructions and cannot keep a persistent pace with his activities. (Id. at 43.) Dr. McGowan could identify no jobs a person can perform if he is unable to concentrate for 65 percent of the day. (Id. at 49-50.) Dr. McGowan further testified that Plaintiff's work as a fast food worker, as Plaintiff actually performed it, did not fit within the definition set out in the *Dictionary of Occupational Titles* ("DOT") inasmuch as Plaintiff did not, and could not, meet all the requirements of the job as defined in the DOT. (Id. at 47.)

## Medical and Other Records Before the ALJ

Plaintiff's Work History Report shows that Plaintiff worked in a warehouse in 1995 and as a pourer at a marble company from 1997 to 1998. Plaintiff worked intermittently as a general laborer in 2000 and 2001. From 1991 to August 1, 2006, Plaintiff worked intermittently as a fast food cook. (Id. at 157.)

Plaintiff's medical records begin with his admission to St. Louis University Hospital in July 2006 with a diagnosis of psychotic disorder, not otherwise specified. He was thirty-seven years of age. He reported that he had been hearing voices for three days and that he was becoming increasingly paranoid. The voices were telling him that his friends were going to kill him. He had been working at Wendy's when the auditory hallucinations began, at which time he quit his job. He reported that he had not had any psychiatric symptoms in the past. He was homeless. Dr. Charles R. Conway noted that Plaintiff was somewhat disorganized and potentially manipulative. Plaintiff refused to allow the evaluation team to call anyone for collateral information. Mental status examination showed Plaintiff to be scared and to have a restricted and paranoid affect. Thought processes were latent and tangential. Thought content included paranoid delusions and auditory hallucinations. Plaintiff's insight and judgment were poor. Dr. Conway noted that he was unable to perform a mini-mental status exam because Plaintiff refused to cooperate. Plaintiff was admitted to the psychiatric unit with a Global Assessment of Functioning ("GAF") score of 35.[4]    A

---

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the

computed ("CT") scan of the brain showed no acute intracranial process. Plaintiff was given Haldol, Ativan, and Risperidone during his hospital stay, and his psychotic symptoms minimized during the last days. Five days after admission, Plaintiff was discharged in stable and improved condition. Upon discharge, Plaintiff reported that he was no longer hearing voices. Plaintiff's discharge medications included Risperidone. He was instructed to follow up at the outpatient clinic at Barnes Jewish Center. His GAF score was then 45.[5] (Id. at 322-52.)

Plaintiff went to the emergency room at St. Louis University Hospital in November 2007 with complaints relating to a sore throat. No other complaints were noted. (Id. at 380-87.)

Plaintiff was seen again at the St. Louis University Hospital emergency room on August 11, 2008, with complaints of knee and ankle pain. It was noted that Plaintiff had a psychotic disorder and previously had a psychiatric admission. No current psychiatric complaints were noted. (Id. at 388-401.)

---

clinician's judgment of the individual's overall level of functioning,'"'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

[5] A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted)

Plaintiff returned to the emergency room on August 28 with complaints of having a toothache for three days. It was noted that Plaintiff had no significant medical history; no psychiatric complaints were noted. (Id. at 227-42.)

Plaintiff was admitted to St. Louis University Hospital in November with a diagnosis of psychosis, not otherwise specified. Plaintiff reported that he constantly heard voices. He denied having any symptoms of depression and any suicidal or homicidal thoughts. It was noted that he had previously been hospitalized and prescribed Risperidone, but did not follow up or take his medication on discharge. Plaintiff reported that he currently lived and worked in a group home. Mental status examination showed Plaintiff to be fairly groomed and to have good eye contact. His mood was good; his affect was euthymic; his thought process was goal directed and logical; his insight and judgment were fair. Dr. Joao H. Ramos noted that Plaintiff had auditory hallucinations, but did not appear to respond to internal stimuli. Plaintiff was assigned a GAF score of 30.[6] He was given Abilify upon admission and was also given Haldol and Ativan for agitation and psychosis. Plaintiff improved during his hospitalization and was discharged on four days later since he was not an immediate danger to himself or others. On discharge, he continued to have auditory hallucinations, was diagnosed with chronic paranoid schizophrenia, and was prescribed Abilify. He was

---

[6]A GAF score between 21 and 30 indicates behavior "considerably influenced by delusions of hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." DSM-IV-TR at 34 (emphasis omitted).

instructed to follow up with Grace Hill Neighborhood Health Center (Grace Hill) on November 26. (Id. at 353-79.)

The next record is from April 2009 and is a Psychiatric Review Technique Form ("PRTF") completed by Joan Singer, Ph.D., a non-examining psychological consultant. She opined that Plaintiff had no medically determinable mental impairment. (Id. at 244-54.)

In July 2009, pursuant to his applications, Plaintiff underwent a consultative psychiatric evaluation by Dr. Aqeeb Ahmad. (Id. at 255-59.) Plaintiff was then forty years old and homeless. He told Dr. Ahmad that he heard constantly voices that, within the past four years, he had been hearing the voices of his ex-wife and her brother. The voices were threatening at times. Plaintiff becomes distracted and confused because he does not know who is talking to him. Plaintiff reported that the voices make him depressed and that he wished he was dead. He was currently not receiving treatment and he was given Abilify when hospitalized six months earlier. Plaintiff reported that he could not afford the medication; nevertheless, it did not help his condition. He goes to a church in the mornings to get breakfast and then cleans the church and studies. Afterwards, he walks the street. He finds a place to sleep when he gets tired and sometimes stays with friends. Mental status examination showed Plaintiff to have normal flow of speech but decreased psychomotor activity. Dr. Ahmad noted that Plaintiff was moderately depressed, worried, and anxious. Plaintiff expressed some death wishes, but had no plans or intent. He was oriented times three and knew the correct year and month, but not the exact date. Dr. Ahmad noted Plaintiff

had some difficulty doing serial sevens and could not subtract seven from 100. He diagnosed

Plaintiff with paranoid schizophrenia, possibly late onset, and rated his current GAF as 25.

Dr. Ahmad concluded:

> At this time, the patient appears fairly dysfunctional. He appears to be actively psychotic with persistent hallucination and ideas of reference. He reports problem with concentration. He apparently has difficult time concentrating on job, keeping up with the work or sometimes getting along with the people. He also has difficulty in managing his funds at this time because of poor ability to calculate.

(Id. at 257.)

The next month, Robert Cottone, Ph.D., a non-examining psychological consultant,

completed a PRTF in which he opined that Plaintiff's mental impairment was severe but was

not expected to last twelve months. Dr. Cottone further opined that Plaintiff's mental

impairment resulted in mild restrictions in activities of daily living, in maintaining social

functioning, and in maintaining concentration, persistence, or pace. His impairment did

result in any repeated episodes of decompensation of extended duration. Dr. Cottone noted

that the record showed Plaintiff's schizophrenia to be very serious but atypical in that there

was no history of a mental disorder in the medical record. He opined that Plaintiff's

condition should improve. (Id. at 260-70.)

Plaintiff visited Grace Hill in May 2010 with complaints of depression. He reported

being anxious and having fearful thoughts and compulsive thoughts or behaviors, depressed

mood, diminished interest or pleasure, feelings of guilt or worthlessness, panic attacks,

restlessness or sluggishness, changes in appetite, sleep disturbance, and thoughts of death or

suicide. Also, he had hallucinations. He reported having been hospitalized in 2008 for suicidal ideation. Dr. Sabrina Jordan-Childs noted Plaintiff had the symptoms of a major depressive episode. She described him as having a depressed affect and depressed overall appearance. Mental status examination was positive for anhedonia. Plaintiff was not anxious, did not exhibit compulsive behavior, was not fearful or forgetful, and did not have flight of ideas or thoughts of grandiosity. Dr. Jordan-Childs noted Plaintiff to deny hopelessness, memory loss, mood swings, obsessive thoughts, and paranoia. He had normal insight, judgment, attention span, and concentration. He was also noted to have suicidal ideation. Dr. Jordan-Childs diagnosed Plaintiff with depression with suicidal ideation and prescribed Celexa. He was referred to Grace Hill Behavioral Health. (Id. at 279-81.)

On that same date, Plaintiff visited Nancy Phillips, L.C.S.W., at Grace Hill for individual therapy. Plaintiff reported hearing voices during the previous four years. The voices were negative and cruel. They sometimes told him to kill himself, but he knew not to listen to those messages. Plaintiff questioned whether his ex-wife had a machine that put these voices in his head. He had been hospitalized twice for the condition, but had not follow upped with a mental health provider or taken medication after discharge. He reported having lived in a shelter for four years. Ms. Phillips noted that Plaintiff was tearful. He was scheduled for further assessment and planning. (Id. at 282-84.)

Plaintiff returned to Grace Hill in June for an intake assessment by Ms. Phillips. It was noted that Plaintiff was homeless and had recently been awarded Medicaid. He was

noted to be depressed and to have been hearing voices since 2006. Plaintiff met with Ms. Phillips and reported having depressed mood, diminished interest or pleasure, fatigue, loss of energy, feelings of guilt or worthlessness, hallucinations, restlessness or sluggishness, change in appetite, sleep disturbance, and thoughts of death or suicide. He no longer took care of himself, bathed only once a week, and rarely brushed his teeth. Ms. Phillips noted, however, that Plaintiff appeared well groomed, had a fresh haircut and groomed beard, and was stylishly dressed. Ms. Phillips also noted Plaintiff did not have any body odor and his teeth were bright. She also noted that he laughed and smiled several times during the assessment. Plaintiff reported hearing voices telling him negative things about himself and making him think that something bad was going to happen. The voices were louder at night. Plaintiff also reported that he is always angry with people because of the negative voices. He had lived on the street and with friends; currently he was living in a ministry shelter. At one point, he thought he was the Holy Spirit, his pastor was God, and the two of them made up two parts of the Holy Trinity. When asked why he did not have a job and get an apartment, Plaintiff responded that he would be required to leave the shelter if he had a job inasmuch as unemployment was a requirement for living there. Plaintiff reported that he will not go to another shelter because the people at the current shelter understand that he is a little crazy and know how to deal with him. He had previously been hospitalized, but had not gone to his scheduled follow up appointments. Plaintiff also reported having a history of drug abuse, i.e., he used marijuana, and of being a heavy social drinker; he stopped using such

substances when he moved into the shelter. Ms. Phillips diagnosed Plaintiff with psychosis and assigned a GAF score of 41. A treatment plan was to be developed after Plaintiff was evaluated by a psychiatrist. (Id. at 274-78.)

In July, on a referral from Grace Hill, Plaintiff visited Dr. Asif Habib at Mid-America Psychiatric Consultants, reporting that he was hearing voices. He also reported that he could read other peoples' minds, that they could read his mind, and that people were after him. Plaintiff was noted to be paranoid and somewhat depressed. He was noted to be taking Cymbalta. Mental status examination showed Plaintiff to be cooperative and to have a sad mood, a full affect, a coherent and goal-directed thought process, an intact memory, and fair concentration, insight, and judgment. Dr. Habib diagnosed Plaintiff with schizophrenia, paranoid type, assigned a GAF score of 55,[7] prescribed Risperdal and Cymbalta, and instructed Plaintiff to follow up for medication management. (Id. at 290-92.)

When Plaintiff returned to Dr. Habib in August, his depression was noted to be stable. Plaintiff reported that he continued to hear voices. He denied any suicidal or homicidal ideation. He described his eating and sleeping habits as fair. Dr. Habib noted that Plaintiff was compliant with treatment. Mental status examination showed Plaintiff's mood to be better. Otherwise, on examination he was as before. He was instructed to increase his

---

[7]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

dosage of Risperdal and to continue with Cymbalta. Ambien was also prescribed. (Id. at 289.)

In September, Kyle DeVore, Ph.D., a non-examining psychological consultant, opined in a PRTF that Plaintiff's schizophrenia and major depressive disorder caused him to have mild limitations in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of an extended duration. After summarizing the evidence of record, Dr. DeVore also opined that Plaintiff can perform simple work with social restrictions. (Id. at 293-304.)

In a Mental Residual Functional Capacity Assessment completed that same date, Dr. DeVore opined that in the domain of understanding and memory, Plaintiff was moderately limited in his ability to understand and remember detailed instructions, but was otherwise not significantly limited. In the domain of sustained concentration and persistence, Plaintiff was moderately limited in his ability to carry out detailed instructions and to work in coordination with or proximity to others without being distracted by them, but was otherwise not significantly limited. In the domain of social interaction, Plaintiff was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. He was not

significantly limited in his ability to ask simple questions or request assistance.  In the domain of adaptation, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation, but was not significantly limited in his ability to be aware of normal hazards, take appropriate precautions, and set realistic goals or make plans independently of others.  Dr. DeVore concluded that Plaintiff was capable of performing unskilled work tasks with very limited social interaction and no public contact.  (Id. at 305-07.)

Plaintiff returned to Dr. Habib in October, reporting that he was doing well.  He also reported that he continued to hear voices, but they had subsided.  His eating and sleeping habits were fair.  He denied having manic symptoms.  Dr. Habib noted that Plaintiff's depression was stable and he was euthymic.  His mental status examination was essentially normal, with the exception of noted paranoia.  His diagnosis and medication regimen were unchanged; he was instructed to return in three months.  (Id. at 308.)

Plaintiff returned in January 2011, reporting that he was "alright."  He continued to have mild hallucinations, but with no commands.  He had not had any episodes of depression or mania.  His eating and sleeping habits were fair.  His mental status examination was normal. His diagnosis was unchanged; his prescription for Risperdal was increased; his other medications were continued as previously prescribed.  (Id. at 309.)

In April, Plaintiff reported to Dr. Habib that he continued to hear voices and was concerned about his finances.  He denied mania.  Dr. Habib noted that Plaintiff's depression

was stable and that he was compliant with his treatment. His mental status was unchanged. He was instructed to continue with Ambien and Risperdal; additional medication was prescribed. (Id. at 310.)

Plaintiff next saw Dr. Habib in August, reporting that he was doing worse and continued to hear voices. His eating and sleeping habits were fair. Dr. Habib noted that Plaintiff's depression had increased and that Plaintiff was compliant with his treatment. His mental status examination was unchanged. His medications were adjusted. He was instructed to follow up in three months. (Id. at 311.)

In November, Plaintiff reported to Dr. Habib that there was no change in his condition. His medications were continued. (Id. at 312.)

In January 2012, Dr. Habib completed a "Medical Statement Concerning Schizoaffective Disorder for Social Security Disability Claim" in which he opined that Plaintiff was markedly limited in activities of daily living and in maintaining social functioning. Dr. Habib further opined that Plaintiff experienced deficiencies in concentration, persistence, or pace that resulted in frequent failures to complete tasks in a timely manner. Dr. Habib reported that Plaintiff did not have any repeated episodes of deterioration or decompensation in a work-like setting, but he had had a documented history of two or more years of an inability to function outside of a highly supportive living situation. With respect to work limitations, Dr. Habib opined that Plaintiff was markedly impaired in his ability to remember locations and work-like procedures; to understand and remember

detailed instructions; to carry out very short and simple instructions; to perform activities within a schedule; to maintain regular attendance; to be punctual within customary tolerances; to work in coordination with and proximity with others without being distracted by them; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. Dr. Habib further opined that Plaintiff was extremely impaired in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. Finally, Dr. Habib opined that Plaintiff was moderately impaired in his ability to understand and remember short and simple instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to accept instructions and respond appropriately to criticism from supervisors; and to travel in unfamiliar places or use public transportation. (Id. at 313-16.)

## The ALJ's Decision

The ALJ found that Plaintiff met he insured status requirements of the Act through December 31, 2011, and had not engaged in substantial gainful activity since the alleged

disability onset date of January 1, 2007.  The ALJ then determined that Plaintiff's left ankle injury, schizophrenia, depression, and substance abuse were severe impairments, but Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity.  (Id. at 64-65.)

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work and could "understand, remember, and carry out at least simple instructions and non-detailed tasks.  [He] claimant should not work in a setting, which includes constant/regular contact with the general public.  [He] should not perform work, which includes more than infrequent handling of customer complaints."  (Id. at 66.)  Plaintiff was able to perform his past relevant work in various fast food restaurants and as a marble machine tender.  Alternatively, the ALJ determined that Plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, bench assembler, hospital product assembler, and inspector/hand packager.

The ALJ concluded that Plaintiff was not under a disability from January 1, 2007, through the date of the decision.  (Id. at 69-70.)

### Discussion

Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole.  He specifically challenges the ALJ's determination regarding his mental RFC, arguing that the ALJ improperly evaluated the treatment records and failed to accord proper weight to the opinion of his treating psychiatrist.  Plaintiff also contends that

the ALJ failed to include relevant mental limitations in the RFC assessment. Finally, Plaintiff claims that the ALJ erred in finding his subjective complaints not to be credible. Plaintiff requests that the final decision be reversed and that the matter be remanded for an award of benefits or for further consideration.

To be eligible for DIB and SSI under the Social Security Act, Plaintiff must prove that he is disabled. **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination

of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The Plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the Plaintiff's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. **Pearsall**, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir.

1992) (internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the Commissioner's decision is not supported by substantial evidence on the record as a whole, and the decision must be reversed and the matter remanded to the Commissioner for further proceedings.

As set out above, Plaintiff challenges the manner and method by which the ALJ determined his RFC, arguing that the ALJ improperly evaluated the treatment records and failed to accord proper weight to the opinion of his treating psychiatrist, Dr. Habib; failed to account for Plaintiff's limitations in concentration, dealing with supervisors and coworkers, and ability to follow simple instructions; and erred in her analysis finding Plaintiff's subjective complaints not to be credible. Plaintiff's arguments are well-founded.

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. **Polaski v. Heckler**, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her

reasons for discrediting the testimony. **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012); **Cline v. Sullivan**, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." **Id.**; see also **Renstrom**, 680 F.3d at 1066; **Beckley v. Apfel**, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. **Hogan v. Apfel**, 239 F.3d 958, 962 (8th Cir. 2001); see also **Casey v. Astrue**, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. **Tellez**, 403 F.3d at 957; **Pearsall**, 274 F.3d at 1218.

Here, the ALJ pointed to inconsistencies in the record that detracted from Plaintiff's credibility. A review of the entirety of the record, however, shows the ALJ's analysis to be flawed. Several of the alleged inconsistencies relied on by the ALJ are not supported by the record and indeed, in some instances, are contrary to the record. Because these discrepancies undermine the ALJ's ultimate conclusion that Plaintiff's mental impairment is less severe than he claims, the matter must be remanded for reconsideration of Plaintiff's credibility and for a more complete review of the record. See **Baumgarten v. Chater**, 75 F.3d 366, 368-69 (8th Cir. 1996).

First, the ALJ referred to Plaintiff's hospitalization in July 2006 as an example of his noncompliance and untruthfulness regarding his condition, specifically noting that Plaintiff

was not taking medications prior to this hospitalization and that Plaintiff reported not having any psychiatric history. The undersigned questions how this is inconsistent with Plaintiff's complaints. Nothing in the record contradicts Plaintiff's report to the intake physician in July 2006 that he had an immediate onset of psychiatric symptoms three days prior to this hospitalization and that he had to leave work because of the symptoms. These complaints are supported by Plaintiff's Work History Report that shows his last job to have ended August 1, 2006, which was the day following his discharge from the hospital; a consulting physician's subsequent opinion that Plaintiff suffered from paranoid schizophrenia with possible adult onset; and a State agency consultant's note that Plaintiff's impairment was atypical given no prior history of a psychiatric impairment, but was nevertheless very serious.

To further support her finding of untruthfulness, the ALJ cited the physician's observations during this July 2006 hospitalization that Plaintiff appeared manipulative and was uncooperative, and that the physician opined that "they were unable to ascertain any psychotic symptoms and surmised that the claimant was using the hospital as a place to 'hide out' rather than staying at a shelter." (R. at 67.) A review of the hospitalization records in their entirety, however, shows the ALJ to have mischaracterized these observations. Rather, the records show Plaintiff to have exhibited significant psychotic symptoms, which improved with treatment, and that the suspicion that Plaintiff was "hiding out" was countered by genuine psychotic symptoms:

> The patient was admitted voluntarily to 4-West psychiatric unit. Initially he was found to be very paranoid, seclusive to his room, complaining of auditory

hallucinations. He required . . . Haldol and Ativan. On re-evaluation the next day his paranoia had decreased. However, the patient did appear to be responding to internal stimuli, staring off into space for long periods of time, eyes fluttering about, mumbling to himself. . . . On the last several days of admission, the patient was not noted to be responding to any internal stimuli and did not appear to be particularly paranoid. He did reveal that he was worried that his friends were going to kill him and that they were waiting outside of his room yelling up to him and he could only hear this while he was in the room. . . . It was considered that he was using this as a place to hide out and a place to stay rather than going to the shelters, but at times he did appear to genuinely be experiencing some psychotic symptoms.

R. at 324.) Because the ALJ misread these medical records, it cannot be said that they support her conclusion as to Plaintiff's noncompliance and untruthfulness.[8]

The ALJ also found that Plaintiff had worked with his alleged disabling impairment and determined that such activity strongly suggested that Plaintiff's impairment would not currently prevent him from working. To support this finding, the ALJ cited Plaintiff's earnings record from 2004 and his work at fast food restaurants prior to working at Wendy's. (See R. at 67.) A review of the record shows that Plaintiff experienced an immediate onset of psychiatric symptoms in July 2006 *while* he was working at Wendy's, that he quit his job at Wendy's because of such symptoms, and that he has not worked since. There is no evidence that Plaintiff experienced any psychiatric symptoms in 2004 or at any time prior to

_____

[8]To the extent other evidence demonstrates that Plaintiff was occasionally noncompliant with treatment, his reported inability to afford such treatment must be acknowledged. See **Benson v. Heckler**, 780 F.2d 16, 18 (8th Cir. 1985) (although evidence showed medication provided relief, other evidence showed that claimant could not afford the medication) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984) (an ALJ must consider lack of finances in determining whether an impairment is remedial)); see also **Murphy v. Sullivan**, 953 F.2d 383, 386 (8th Cir. 1992) (economic justification or limited or no treatment can be relevant to a disability determination).

- 24 -

his work at Wendy's. The record simply does not support the ALJ's finding that Plaintiff previously worked with his mental impairment.

Additionally, the ALJ found Plaintiff's ability to "perform a full range of daily activities" to be inconsistent with his subjective complaints. In making this finding, the ALJ referred to Plaintiff cleaning the church or studying, using public transportation, watching television, and doing laundry on a weekly basis. (R. at 68.) It cannot be said that a person suffering from a mental impairment who cleans and studies at a church shelter where he resides, watches television, and does his laundry once a week is engaged in a "full range" of daily activities such that his claims of disabling psychiatric symptoms are not credible.[9] See **Reed v. Barnhart**, 399 F.3d 917, 922-24 (8th Cir. 2005). These limited activities performed in the protected environment of a church shelter are not of sufficient quality, frequency, and independence to discredit Plaintiff's claim that he is unable to sustain work-related activities over a period of time. See **Id.**; see also **Boettcher v. Astrue**, 652 F.3d 860, 866 (8th Cir. 2011).

The ALJ also found that Plaintiff's statement that he was no longer taking care of his personal hygiene was inconsistent with Ms. Phillips' observation during his intake assessment

---

[9]To the extent the ALJ relied on Plaintiff's ability to use public transportation, the Court notes that the ALJ supported this finding by citing to the September 2010 PRTF completed by Dr. DeVore. (See R. at 68, 303.) Other than this PRTF notation that Plaintiff "uses transportation," the only reference in the record to Plaintiff's use of public transportation is from the Function Report he completed in August 2010. (See id. at 172.) A careful review of that Report reveals that Plaintiff repeatedly stated that he does not go anywhere and does nothing during the day except watch television. (Id. at 169-76.)

that he appeared to be well groomed, and that Plaintiff's statement that he remained unemployed so he could continue to live at the shelter suggested that his claimed limitations may be for secondary gain rather than due to actual debilitating symptoms. While these findings have some support in the record, they nevertheless are insufficient to support the ALJ's decision to discount Plaintiff's subjective complaints given the ALJ's several misstatements and misapprehensions of the record in this case. See **Baumgarten**, 75 F.3d at 370.

Also, the Court notes that, in determining the listing-level severity of Plaintiff's mental impairment, the ALJ stated that "[t]he record does not contain evidence of inpatient psychiatric hospitalizations after the alleged onset date." (R. at 65.) Plaintiff's alleged onset date of disability is January 1, 2007. The record shows that Plaintiff was psychiatrically hospitalized for a five-day period in November 2008; indeed, the ALJ questioned Plaintiff about this 2008 hospitalization. (Id. at 26-28.) This erroneous reading of the medical record, together with the failure to properly consider Plaintiff's subjective complaints, creates uncertainty and casts doubt upon the ALJ's rationale for denying Plaintiff's claims. See **Willcockson v. Astrue**, 540 F.3d 878, 879-80 (8th Cir. 2008). "[I]naccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." **Draper v. Barnhart**, 425 F.3d 1127, 1130 (8th Cir. 2005).

Given the several inconsistencies in the ALJ's reading of the record, it cannot be said that the ALJ demonstrated in her written decision that she properly considered all the

evidence relevant to Plaintiff's complaints or that the evidence she considered so contradicted Plaintiff's subjective complaints that his testimony could be discounted as not credible. See **Masterson v. Barnhart**, 363 F.3d at 731,738-39 (8th Cir. 2004); **Baumgarten**, 75 F.3d at 370. Consequently, the matter shall be remanded for reconsideration of Plaintiff's credibility, with such reconsideration to include a proper review of the record and an appropriate analysis as required by, and for the reasons discussed in, *Polaski*.

Because "[s]ubjective complaints . . . are often central to a determination of a claimant's RFC," **Fredrickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004), an ALJ's RFC assessment based on a faulty credibility determination is called into question because it does not include all of the claimant's limitations. See **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001). This is especially true where an ALJ fails to properly consider evidence of a claimant's mental impairment. See **Pate-Fires v. Astrue**, 564 F.3d 935, 944-45 (8th Cir. 2009) (ALJ's failure to properly evaluate evidence of mental impairment resulted in RFC not supported by substantial evidence). Additionally, given the ALJ's failure to properly consider the medical evidence of record, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. See **Holmstrom**, 270 F.3d at 722. Finally, vocational expert testimony based upon a hypothetical that does not account for all of a claimant's limitations cannot constitute substantial evidence to support an ALJ's decision. See **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010).

## Conclusion

For the foregoing reasons, the ALJ failed to properly evaluate Plaintiff's credibility and improperly analyzed the medical evidence of record in this cause, resulting in an RFC determination that was not supported by substantial evidence on the record as a whole. The matter will therefore be remanded for further consideration. Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and that this case is **REMANDED** to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of July, 2014.